**CENTURY INDEMNITY CO. et al. v. CARNES.**

**No. 14043.**

Court of Civil Appeals of Texas. Fort Worth.

March 1, 1940.

Rehearing Denied April 5, 1940.

Todd, Crowley & Thompson, of Fort Worth, and Touchstone, Wight, Gormley, Strasburger & Price, of Dallas, for appellants.

Raymond E. Buck and Frank J. Knapp, both of Fort Worth, for appellee.

SPEER, Justice.

This is a Workmen's Compensation case, controlled by Articles 8306, 8307, 8308 and 8309, Revised Civil Statutes, the various sections and subsections thereof and the amendments thereto in Vernon's Annotated Texas Civil Statutes.

Ralph B. Carnes sued Century Indemnity Company in the 17th District Court of Tarrant County, Texas, to recover compensation for injuries sustained while in the course of his employment, alleging that H. Linsk & Company, a corporation, was his employer at the time he received the injury.

Judgment was entered in favor of Carnes, and Century Indemnity Company, the insurance carrier, has appealed. Hereinafter we shall refer to Century Indemnity Company as appellant and to Ralph B. Carnes as appellee. When necessary to refer to the employer we shall do so as Linsk.

Unlike most cases which involve a construction of the Workmen's Compensation Act of this State, it is admitted by all parties that there is only one question to be determined by this court, and that is: "Whether or not appellee at the time of his injury was such an employee of H. Linsk & Co. as entitled him to compensation insurance. * * *"

Appellant contends that appellee was not such an employee of Linsk at the time as would be protected by its policy of insurance, but was an independent contractor. That this being true, it was entitled to a peremptory instruction to the jury and a judgment thereon. Appellee contends that he was an employee of Linsk and covered by the policy of compensation insurance carried by Linsk with appellant.

The alleged employer had its principal place of business in Philadelphia, Pa., and appellee was its traveling salesman in Texas and three other states, handling a line of ready-to-wear garments. He was in an automobile accident while engaged in the discharge of his duties and received serious bodily injuries, as a result of which he sought the compensation involved in this suit.

If appellee's relation to Linsk was that of an independent contractor, he was not covered by the compensation insurance carried, appellant was not bound and appellee cannot recover in this action. It is important then to approach the point with a clear understanding of what is meant by the term "Independent Contractor." Much has been written on the subject and we find that what has been said by our courts in scores of opinions, is concisely stated in the text found in 23 Tex.Jur., Sect. 3, p. 542, in this language: "Numerous decisions make it clear that when service is rendered in the course of an independent occupation, and the will of the employer is represented only as to the result of the work and not as to the means by which it is carried out, or the details involved in its performance, the person rendering the service is an independent contractor. The relationship of employer and independent contractor is distinguished from those of master and servant and principal and agent by the nature of the control exercisable over the work to be done and the person performing it. In the case of a master or principal, control extends to manner of doing the work and is more complete and detailed. An independent contractor, unlike a servant or agent, is not under the immediate direction of the employer." The quoted text is supported by many cases to which we also make reference.

It is not always easy to locate with perfect precision the line of demarcation between the two relationships. Each case

stands largely upon the facts established at the trial. It is easy to perceive a situation in which it cannot be doubted that the relationship of master and servant exists when the servant, who perchance is an expert in his line with better knowledge than the master of just how the minute details of his task are to be performed, and with the knowledge of that fact the master directs him to perform the duty with the expectation that it will be efficiently performed. In such circumstances the employee does not become an independent contractor, but he remains the trusted servant of the master.

The contract between appellee and Linsk is neither wholly written nor oral. It is made up of fragments of letters passing between them, by long distance telephone conversations, and by a construction of a previous contract, consummated in the same manner, between Linsk and a brother of appellee who preceded him in the work.

The statement of facts before us contains 480 pages and obviously it would be impossible for us to do more than refer briefly to certain parts which bear upon the point under consideration. Finley Carnes, the brother of appellee, made a deal with Linsk late in June, 1936, to sell the latter's goods in Texas. His employment was likewise brought about by correspondence, telephone conversations and parol agreements with Linsk. Finley Carnes went to Philadelphia and talked with a representative of Linsk. His purpose in going there was to ascertain with some degree of certainty what he would receive for his services and to learn what his duties would be; he was shown the line of goods to be sold and told the manner in which they were to be sold—the company's method of selling its merchandise. Witness was told that the company would expect him to have an automobile in which to travel; that he would be expected to visit customers in the larger cities every thirty days and those in the smaller towns once or twice each season; he was required to send in a route sheet each week showing where he would be during the following week, blanks were furnished him for that purpose; that he would be required to carry Linsk's line exclusively; that he was to receive $50 each week and five per cent. commission on certain lines and seven per cent. on others, for all goods sold; that the $50 per week was sent to him by Linsk through-

out the time whether his commissions amounted to that sum or not. The witness said Linsk wrote him at one time they had heard he was carrying another line of goods in connection with theirs, and protested his acts, but that in fact he had not done so and the matter was agreeably settled.

The testimony reflects that during December 1936, appellee traveled with his brother Finley Carnes for the purpose of learning the trade and becoming acquainted with the customers. On January 1, 1937, Finley Carnes resigned the position with Linsk in a long-distance telephone conversation and recommended that they employ appellee upon the same terms upon which witness had been employed; Linsk agreed to the arrangement and appellee took over the work under the same terms and conditions that his brother had previously performed it.

Appellee testified that he talked on the telephone to Linsk at Philadelphia and confirmed his conversation by letter which shows to be dated January 7, "1938", but evidently intended for 1937, in which he expressed himself as understanding that he was to have Texas, Louisiana, Arkansas and Mississippi as a territory, and was to continue under the same arrangements previously had with his brother, viz., "to receive 7% and 5% commission, with $50 per week drawing account against the same." In that letter appellee, in compliance with Linsk's requirements, inclosed his route list for the next week, showing that he would cover South Texas during that time, and requested the remittance of a check for the amount agreed on.

A letter from Linsk to appellee dated January 11, 1937, was introduced, acknowledging appellee's letter of the 7th, in which this was said: "The Louisiana buyers make their purchases very early, and Mr. Harry Linsk, therefore, feels that it will be to your advantage to work this territory first, as they are really bigger buyers than the Texas territory, and he would not want you to miss any of the business that can really be had."

Appellee was told by Linsk in a letter under date of March 16, 1937, to kindly watch datings and was warned that that was an evil which must be overcome, and reasons were given in the letter why it was so important, and insisting that they must have his co-operation in that respect.

In the same letter he was instructed to not take orders for small quantities because it was too costly to fill them. He was there likewise warned to carefully watch "discard lists" and said: "When a list is sent out, it means absolutely the end of those particular numbers. Act immediately in the future please." By letter of March 25, 1937, appellee was requested to sell as promptly as possible all goods carried over from a past season, and that it was imperative that he give separate copies of orders on "sheers"; that those instructions must be followed to the letter. Under date of March 17th he was instructed to call on two named firms at San Antonio, Texas, and convey certain information to them about deductions of freight on former orders. Several other letters are shown in the record in which he was given instructions concerning certain lines of goods mentioned and was told that these instructions are imperative and must be observed. March 19th, in a letter Linsk asked that certain samples be returned because the articles were oversold and further instructions that if appellee's customers desired to advertise certain articles Linsk would furnish cuts and mats for that purpose; May 8th, Linsk wrote appellee for the names of customers in different cities with a view to advertising before appellee was scheduled to call upon them; he was urged to give the matter prompt attention. By letter of February 27, 1937, appellee was told that Linsk desired its representatives to go out about March 14th, in an effort to sell a certain line, and he was asked to give his views on the subject regarding his own territory and was cautioned to be definite and not general. June 7, appellee was told in a letter in effect that certain deliveries would be made starting with July 15th, and this definite instruction was given: "Now in case you cannot interest a customer in the folders in a certain town, please endeavor to sell the lucky charm frocks anyway, as we are interested in getting additional business." In a letter dated June 26, 1937, Linsk acknowledged receipt of appellee's route list and noted that he would not visit Louisiana until July 3d, and said they thought the date set was rather late for that territory "As there are some large department stores from whom we feel you could obtain very good business if you got there in time before all our competitors. Mr. Linsk therefore, thinks it advisable for you to change your route

and get there before the 3rd if possible." Other letters were introduced in which Linsk advised appellee that certain customers in his territory were inquiring about the goods and he was requested to call upon them at once and display the line.

On September 23, 1937, appellee received a letter which as we construe it gives some very definite instructions in regard to the details of his work; it is lengthy, but briefly it instructed him: "Do not give datings, this always causes so much difficulty and delays delivery"; to mark orders if confirmation is required; deliveries were not to be promised confined to November 1st and December 1st; appellee was exhorted to watch carefully prices, since mistakes caused the house much trouble; shipping instructions must accompany the order, and customers must be advised that orders were filled F. O. B. Philadelphia.

We have not attempted to set out those parts of the evidence which appellant contends support its theory of the case, viz., that Linsk had no right of control over the details of how appellee should perform his contract in selling the merchandise, thus rendering him an independent contractor. Nor have we referred to all that was offered to the contrary, but only enough to show what we believe to be sufficient to raise a jury question. The burden of appellant's contention here is that there was no competent testimony to raise the question of master and servant, and, therefore, its peremptory instruction should have been given; that instruction having been refused then the court should have sustained its motion for judgment non obstante veredicto.

The contract between Linsk and appellee was not wholly in writing. Viewing it as contended for by all parties, its legal effect was not such as could or should have been construed by the court, but its apparent ambiguities were susceptible to explanation by parol evidence, all of which presented jury questions of fact. Howell v. Continental Casualty Co., Tex.Civ.App., 110 S.W.2d 210, writ dismissed, and cases cited.

The first special issue submitted to the jury, to which there was no objection by appellant, reads: "Do you find from a preponderance of the evidence that H. Linsk & Company, in the contract made between the company and Ralph B. Carnes, in January 1937, retained control over the said.

Carnes in respect to the details and the means and method by which he should do his work?" The answer was "Yes".

Under a proper explanation by the court of what constituted an independent contractor, Special Issue No. 9 was propounded in this language: "Do you find from a preponderance of the evidence that plaintiff Ralph B. Carnes was not an independent contractor?" The question was answered "He was not". No complaint was made by appellee as to placing the burden of proof as contained in the issue, but we need not take cognizance of that now. Carter v. Hodges, Tenn.Sup., 132 S.W.2d 211.

It is a well settled rule of law in this State that evidence is sufficient to support a jury verdict if to discard all adverse evidence and to give credit to all evidence that is favorable to the successful party and indulging every legitimate conclusion that is favorable to him, a jury might have found in his favor. 17 Tex.Jur., sect. 410, p. 911; see, also, City of Houston v. Chapman, 132 Tex. 443, 123 S.W.2d 652; McCarty v. Hogan et al., Tex.Civ.App., 121 S.W.2d 499, writ dismissed, and the many cases there cited.

An equally well established rule is that where the evidence is conflicting on a given point such as would support a verdict either way and the jury resolves the facts in favor of one party, the appellate court is powerless to substitute its own findings for that of the jury. 41 Tex.Jur., Sect. 378, p. 1246; Oats v. Dublin Nat. Bank, 127 Tex. 2, 90 S.W.2d 824; Choate v. San Antonio & A. P. Ry. Co., 91 Tex. 406, 44 S.W. 69; Post v. State, 106 Tex. 500, 171 S.W. 707; Sproles Motor Freight Lines v. Juge, Tex.Civ.App., 123 S.W.2d 919, writ dismissed, judgment correct.

The parts of the testimony offered to which we have referred, and even more in the record than that mentioned by us, shows to our minds that the parties themselves construed their contract in a way that reserved to the employer a right to govern and control the details of how appellee should do his work; certainly every detail was not commanded by Linsk, but evidenced by the things done by Linsk and observed by appellee, the employer did exercise that control in such matters and in such manner as it thought necessary for the performance of appellee's duties. There was a requirement that appellee travel in an automobile while visiting the trade; that he furnish his own transportation; visit customers in the cities once a month and in the smaller towns once or twice a season; keep Linsk posted each week where he would be during the following week; when appellee chose a certain route for a given week he was instructed to change and make other territory for reasons stated; to urge sales of certain classes in preference to others; to avoid making certain promises of delivery; to go to certain territory at given dates; details were given to appellee concerning advertising by customers and that Linsk would furnish advertising matter. It appears that appellee's employment was not for a definite period but could be terminated by Linsk at any time. Under Federal requirements, appellee was required to take out a Social Security card and the amount due the government thereon was deducted by Linsk from his pay check. See Carter v. Hodges, Tenn.Sup., 132 S.W. 2d 211. The employer took out compensation insurance covering Linsk's clothing salesmen, located in the State of Texas. The policy provides "Operations in other States covered under separate policy." Appellee was the only clothing salesman Linsk had in Texas, he had the exclusive right to sell Linsk's goods to the trade in Texas.

We think there was ample testimony adduced, of a substantial nature and of probative effect, to support the verdict and judgment entered. In fact as well as in good conscience and reason it was all but conclusive.

The cases cited by appellant in support of its contention do not announce a different rule to that applied by us in this case. One of the early cases, Cunningham v. International Railroad Co., 51 Tex. 503, 32 Am.Rep. 632, discusses the distinguishing features between work done by independent contractors and that done by those termed servants. The rule there applied was in these words: "The true test * * * by which to determine whether one who renders service to another does so as a contractor or not, is to ascertain whether he renders the service in the course of an independent occupation, representing the will of his employer only as to the result of the work, and not as to the means by which it is accomplished."

In National Cash Register Co. v. Rider, Tex.Com.App., 24 S.W.2d 28, approved by

the Supreme Court, it was held that in a case where damages were sought against an alleged principal for the negligent acts of an alleged servant, the relationship between those two would control. It was there said (24 S.W.2d at page 30): "In every case which turns upon the nature of the relationship between the employer and the person employed, the essential question to be determined is whether the employer had the right to exercise control over the details of the work." It was further found in that case that the National Cash Register Company did not have the right of control of the employee in any essential part of the work which he was doing for its benefit.

The case of Southern Surety Co. v. Scheel, 125 Tex. 1, 78 S.W.2d 173 (incorrectly cited at both places in briefs), is not different from the earlier cases cited. The facts set out in the opinion disclose the soundness of the conclusions reached by the court in holding that deceased was an independent contractor. The facts in that case are not comparable to those before us. The distinguishing features of other cases cited and relied upon by appellant prompt us to pretermit a discussion of each.

We have not attempted to relate that part of the testimony in this case which was most favorable to appellant's contention that Linsk had no control over the details of how appellee was to perform his work; this, because of the conflicts shown, and determined by the jury against appellant's theory. But appellant is insistent that it should have had an instructed verdict because, among other things, appellee signed a statement which contained this: "Neither company have anything to do with my routes or routing. When and where I traveled was strictly up to me, they understanding of course, that I was in much better position to choose where and when to go than they were." Appellant also says that by his deposition appellee further testified, with reference to his contract with Linsk and the authority the employer had to control the manner in which he performed his work, as follows: "Well, there was nothing said about telling me where to go, but they have that privilege. That is one of the things with all salesmen that any firm can do." The first quoted statement, although against appellee's interest and contrary to his contention made upon the trial, was not conclusive. It only raised an issuable fact to be determined by the jury from all the facts and circumstances developed upon the trial. New St. Anthony Hotel Co. v. Pryor et al., Tex.Civ.App., 132 S.W.2d 620, writ refused, and the many cases there cited.

Appellant further urges that the uncontradicted testimony shows appellee was carrying samples and placing orders for another concern along with those of Linsk. This is all true, but there is ample evidence in the record to the effect that Linsk had consented for him to do so. By this token appellant contends that appellee could not have been such an employee of Linsk as would entitle him to protection under the insurance contract for the reason, it is said, "No man can serve two masters." (Matt. 6; 24.)

Appellant in its briefs, no doubt with full knowledge that the findings of the jury upon the facts were binding on this court, displays the thought that it, like other appellants in cases cited, had been penalized by an unsympathetic jury. Our jury system is not all that one might hope for, nor will the time ever come, we fear, that men's acts will always be right; but until an improved procedure is provided we must abide by such as we have. All men are fallible; none are perfect, we perceive, even though we have the Divine command of "Be ye therefore perfect, even as your Father which is in Heaven is perfect." (Matt. 5; 48.)

Our courts have so frequently and uniformly declared that the jury "is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony," that it has become axiomatic—who is there to gainsay it? Apropos this point, the Supreme Court of Missouri, in Whiteaker v. Chicago, R. I. & P. R. Co., 252 Mo. 432, 160 S.W. 1009, at page 1012, said: "May not one with propriety * * take leave to recur to first principles and observe, to wit, that the invention of a jury to weigh and determine the credit due to human testimony, and settle facts in doubt or dispute in a trial at law, is to be rightly taken as one of the splendid achievements of civilized man. While not ideally perfect, yet, having been brayed in the mortar of experience with the pestle of common sense, as human institutions run, trial by jury has stood the test of use and justifies itself as indispensable. * * A jury trial 'is the most cherished, if

not the most valuable institution, we have derived from our Saxon ancestors.' * * The average judgment of 12 jurymen of average sense, drawn, as they are, from all the walks of life and impartially selected * * * is more likely to reach a practical result in sifting, weighing, rejecting, reconciling proof, and deciding facts than is that of the trained and technical reasoner or specialist whose mind runs in the groove of artificial analysis and logic; for peradventure men do not usually get into trouble through logical processes, and logicians cannot always get them out of it."

We conclude that there is ample testimony of a substantial nature in this case to present an issue of fact as to whether, under the contract between Linsk and appellee, the former retained the right of control over the latter with respect to the details and the means and method by which he should do his work. This question was answered by the jury in the affirmative. Assuming then, as we must, this much is established as a fact, the relationship of master and servant existed as a matter of law, between those parties, and appellee could recover his compensation for injuries sustained. This being admittedly the only point involved in this appeal, the judgment of the trial court based upon the verdict should be affirmed. It is accordingly so ordered.